PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
‒‒‒‒‒‒

No. 11-1393
‒‒‒‒‒‒

JANICE QUILLOIN, an individual,
on behalf of herself and others similarly situated

v.

TENET HEALTHSYSTEM PHILADELPHIA, INC.,
d/b/a HAHNEMANN UNIVERSITY HOSPITAL;
TENET HEALTHCARE CORPORATION;
TENET HEALTHSYSTEM HAHNEMANN, LLC,

Appellants
‒‒‒‒‒‒

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-09-cv-05781)
District Judge:  Honorable Anita B. Brody
‒‒‒‒‒‒

Argued September 21, 2011
Before:  FISHER, HARDIMAN and
GREENAWAY, JR., *Circuit Judges*.

(Filed: March 14, 2012)

James N. Boudreau (Argued)
Christina Tellado-Winston
Greenberg Traurig
2001 Market Street
Suite 2700 Two Commerce Square
Philadelphia, PA  19103

    *Counsel for Appellants*


Gary F. Lynch (Argued)
Carlson Lynch
36 North Jefferson Street
P.O. Box 7635
New Castle, PA  16107

Gerald D. Wells, III
Faruqi & Faruqi
101 Greenwood Avenue, Suite 600
Jenkintown, PA  19046

    *Counsel for Appellee*

_____

OPINION OF THE COURT

_____

FISHER, *Circuit Judge*.

Tenet Healthcare Corporation, along with two of its subsidiaries, appeals from the District Court's denial without prejudice of its motion to compel arbitration. The central issue is whether the District Court erred in finding genuine disputes of material fact that might render the arbitration agreement unconscionable and unenforceable. Finding no such disputes, we will reverse.

I.

Plaintiff and Appellee Janice Quilloin ("Quilloin") is a registered nurse with an associate's degree, who began working at Hahnemann University Hospital in October of 2006. In February 2008, Quilloin resigned to take another job. Later that year, she reapplied for a position at Hahnemann, and was rehired in December 2008. She continued working at Hahnemann until November 2009. Hahnemann University Hospital is owned by Tenet HealthSystem Hahnemann, LLC and managed by Tenet HealthSystem Philadelphia, both subsidiaries of Tenet Healthcare Corporation, a health care services company with subsidiaries operating 55 hospitals with over 14,000 beds, as of December 31, 2008. Tenet Healthcare Corporation, Tenet HealthSystem Hahnemann, LLC and Tenet HealthSystem Philadelphia (collectively "Tenet"), are all Defendants and Appellants in the present action.

On or around the time that Quilloin began her employment, both on October 9, 2006 and on January 5, 2009, she signed the "Employee Acknowledgment" form, which acknowledged receipt of the "Fair Treatment Process" brochure ("FTP"). Quilloin at first claimed that she did not

3

sign a form in October 2006, but only signed in January 2009. However, when Tenet subsequently produced an "Employee Acknowledgement" form signed by Janice Quilloin on October 9, 2006, Quilloin filed a supplemental submission "'acknowledging signing that document' but emphasizing her 'lack of recall' of that act." *Quilloin v. Tenet HealthSystem Philadelphia, Inc.*, 763 F. Supp. 2d 707, 712 n.4 (E.D. Pa. 2011). Quilloin does not now dispute that she signed the Employment Acknowledgement or whether she received the FTP.

Quilloin alleges that she was not informed that she would have to commit to arbitration in order to be employed by Tenet. She also alleges that when she was rehired, she did not remember being previously required to sign the "Employee Acknowledgement" form, and thus, was not expecting to sign it a second time.

The "Employee Acknowledgment" forms that Quilloin signed are only one page long. Although a few words were altered between 2006 and 2009, the differences are minor and not material to this case. Following three paragraphs regarding the employee handbook and standard of conduct, the 2009 Employee Acknowledgement reads:

> "I acknowledge that I have received a copy of the Tenet Fair Treatment Process brochure. . . . I hereby voluntarily agree to use the Company's Fair Treatment Process and to submit to final and binding arbitration any and all claims and disputes except 'Excluded Issues' that are related in any way to my employment or the

4

termination of my employment with Tenet. I understand that final and binding arbitration will be the sole and exclusive remedy for any such claim or dispute against Tenet or its parent, subsidiary or affiliated companies or entities, and each of its and/or their employees, officers, directors or agents, and that, by agreeing to use arbitration to resolve my dispute, both the Company and I agree to forego any right we each may have had to a jury trial on issues covered by the Fair Treatment Process. I also agree that such arbitration will be conducted before an experienced arbitrator chosen by me and the Company, and will be conducted under the Federal Arbitration Act and the procedural rules of the American Arbitration Association ('AAA').

I further acknowledge that in exchange for my agreement to arbitrate, the Company also agrees to submit all claims and disputes it may have with me to final and binding arbitration, and that the Company further agrees that if I submit a request for binding arbitration, my maximum out-of-pocket expenses for the arbitrator and the administrative costs of the AAA will be an amount equal to one day's pay (if I am an exempt employee) or eight times my hourly rate of pay (if I am a non-exempt employee), and that the Company will pay all of the remaining fees and administrative costs of the arbitrator

and the AAA. I further acknowledge that this mutual agreement to arbitrate may not be modified or rescinded except by a written agreement signed by both me and the Company."

The FTP brochure outlines the internal grievance process culminating in arbitration, as well as the parameters of the arbitration agreement itself. The FTP does not state that claims regarding the validity of the arbitration agreement itself must be arbitrated. Under "Application and Coverage" the brochure states that "[t]he FTP . . . covers all disputes relating to or arising out of an employee's employment with the company or the termination of employment. . . . [except for] those listed in the 'Exclusions and Restrictions' section[.]" Notably, neither party argues that one of the enumerated exclusions or restrictions is applicable here.

The FTP outlines the steps employees are required to follow to resolve disputes, and explains approximately how long Tenet would take to respond to each step in the process:

1. "Submit Dispute to Supervisor[,]" who will "respond . . . as soon as possible, usually within seven calendar days from the date you raised the issue"

2. "Appeal Supervisor's Decision to Department Head[,]" who will "respon[d] . . . as soon as possible, usually within seven calendar days of the date the Department Head receives your

6

completed FTP Dispute Resolution Form"

3. "Appeal Department Head's Decision to Administration[,]" which will "respon[d] . . . as soon as possible, usually within seven calendar days of the date you request review under Step 3"

4. "Appeal administration's decision to FTP Committee[,]" which will "meet as soon as possible, usually within 30 days of your request. . . . [and] promptly . . . decide the issue(s)"

5. "Final and Binding Arbitration"

A limitations clause states that "[a]ny request for arbitration under the FTP must be made within one year after the event giving rise to the dispute. . . . [or], if a longer limitations period is provided by a statute governing your claim, then your claim will be subject to the longer limitations period provided by the statute."

The FTP also includes provisions for fees and remedies. In one clause, the FTP states that "[y]ou and the company will be responsible for the fees and costs of your own respective legal counsel, if any, and any other expenses and costs, such as costs associated with witnesses or obtaining copies of hearing transcripts." In another provision, entitled "*Authority of Arbitrator*," the FTP states that "[t]he arbitrator has the authority to award any remedy that would

7

have been available to you had you litigated the dispute in court under applicable law." Elsewhere, the FTP states that "no remedies that otherwise would be available to you or the company in a court of law will be forfeited by virtue of the agreement to use and be bound by the FTP."

On December 4, 2009, Quilloin filed suit in the United States District Court for the Eastern District of Pennsylvania, asserting a collective action against Tenet under the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201-19, as well as several state-based class action and common law claims.[1] *See Quilloin*, 763 F. Supp. 2d at 711. In its Answer filed on February 19, 2010, Tenet asserted the existence of an arbitration agreement as an affirmative defense.

On June 10, 2010, Tenet filed a motion to compel compliance with the agreement to arbitrate.[2] On July 2, 2010, Quilloin responded, claiming, among other things, that the

---

[1] The details of this underlying action are not relevant to the claims we are asked to examine on appeal, which solely address the denial of a motion to compel arbitration.

[2] Technically, Tenet filed a motion to dismiss, or, in the alternative, to stay proceedings and compel compliance with the agreement to arbitrate; however, as the District Court noted, "a stay, rather than a dismissal, is the required course of action when compelling arbitration." *Quilloin v. Tenet HealthSystem Philadelphia, Inc.*, 763 F. Supp. 2d 707, 711 n.2 (E.D. Pa. 2011) (citing *Lloyd v. HOVENSA, LLC,* 369 F.3d 263, 269 (3d Cir. 2004).

agreement to arbitrate was unconscionable. Quilloin did not file a motion to dismiss or for summary judgment.[3]

The District Court issued an order on January 20, 2011, *see id*. at 735, finding that genuine disputes of material fact remained as to whether the arbitration agreement was enforceable,[4] and denying the motion to compel. On

---

[3] We note this here because on appeal, Quilloin asks that we affirm the District Court's denial of the order, or in the alternative, that we find the arbitration agreement unconscionable and unenforceable as a matter of law. We have no such alternative. Only "final decisions of the district courts" are appealable, 28 U.S.C. § 1291, and because Quilloin neither filed nor claims to have filed a motion to dismiss or for summary judgment, the District Court issued no corresponding order. Thus, we cannot now find that Quilloin is entitled to a judgment finding the agreement unenforceable as a matter of law. *See also* 9 U.S.C. § 16 (discussing the appealability of arbitration decisions). At most, we would have the authority to affirm the district court's finding that a genuine dispute of material fact remained.

[4] Technically, the District Court found that genuine "issues" of material fact remained. *See Quilloin*, 763 F. Supp. 2d at 735. However, in 2010, the Federal Rules of Civil Procedure were amended, and the wording for the summary judgment standard was changed to require review for genuine "dispute[s]" of material fact. Fed. R. Civ. P. 56(a).

9

February 9, 2011, Tenet filed a timely notice of appeal, commencing the present action.

## II.

The District Court had jurisdiction over this case pursuant to 28 U.S.C. § 1331. We have jurisdiction under 9 U.S.C. § 16 to review the District Court's order denying a motion to compel arbitration.

Our jurisdiction is not affected by the fact that the order was denied without prejudice. The Federal Arbitration Act ("FAA") clearly "provides for interlocutory appeals from a District Court's refusal to compel arbitration" regardless of whether the appeal is from a final decision. *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 102-03 (3d Cir. 2000) (construing the FAA, as codified at 9 U.S.C. § 16). In *Sandvik*, the district court denied a motion to compel arbitration, "conclud[ing] that it could not order arbitration until it determined the validity of the underlying contract." 220 F.3d at 102. Sandvik challenged our jurisdiction, claiming that the "refusal to order arbitration was not final[.]" *Id*. However, we held that "[t]he language of [9 U.S.C.] § 16 provides for appeals of orders denying arbitration, and it makes no distinction between orders denying arbitration and 'final orders' that accomplish the same end." *Id*. The structure of Section 16 is consistent with this interpretation, because otherwise, "the provision providing for appeals from denials of orders to arbitrate [under § 16(a)(1)] would become surplusage in light of the more expansive language in § 16(a)(3) [providing for appeals from final decisions with respect to arbitration]." *Id*. at 103. Finally, we found it

10

significant "that Congress decided to use the word 'final' in one part of the statute, but declined to do so in the section that declares that orders denying motions to compel arbitration are indeed appealable." *Id*. Under *Sandvik*, there can be no doubt that we have the authority to review an appeal from the District Court's order denying a motion to compel arbitration, irrespective of the fact that the order was denied without prejudice.

"We exercise plenary review over questions regarding the validity and enforceability of an agreement to arbitrate." *Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 177 (3d Cir. 2010). Specifically, motions to compel arbitration are reviewed under the Federal Rules of Civil Procedure summary judgment standard, *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 & n.9 (3d Cir. 1980), permitting judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Furthermore, "[i]n reviewing the record, we are required to view the facts and draw inferences in the light most favorable to the nonmoving party." *Ray v. Twp. of Warren*, 626 F.3d 170, 173 (3d Cir. 2010) (citation omitted).

III.

A.

Tenet argues as a threshold matter that the District Court erred in considering Quilloin's claim that the arbitration agreement was unconscionable, because Quilloin failed to direct her challenge at a specific clause within the

arbitration agreement. Essentially, Tenet claims that without a challenge to some specific clause, the District Court may not inquire into issues of arbitrability. We disagree.

"Because this is a question of arbitrability, it is governed by the [FAA]." *Khan v. Dell Inc.*, No. 10-3655, 2012 WL 163899, at *4 (3d Cir. Jan. 20, 2012) (citing *Puleo*, 605 F.3d at 180). The FAA manifests "a congressional declaration of a liberal federal policy favoring arbitration agreements . . . ." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983). However, questions of arbitrability, including challenges to an arbitration agreement's validity, are presumed to be questions for judicial determination. *Puleo*, 605 F.3d at 178 (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quoting *AT&T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 649 (1986)). This is because the FAA places arbitration agreements on "an equal footing with other contracts" and thus, like any other contract, a plaintiff may bring a challenge to court claiming that an agreement to arbitrate is unenforceable based on any of the "generally applicable contract defenses, such as fraud, duress, or unconscionability . . . ." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745-46 (2011) (construing the FAA as codified at 9 U.S.C. § 2) (citation and internal quotation marks omitted).

On the other hand, a challenge to "the validity of the contract as a whole, as opposed to the arbitration clause in

12

particular, does not present a question of arbitrability." *Puleo*, 605 F.3d at 180 n.4 (citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46 (2006)); *accord Rent-A-Center v. Jackson*, 130 S. Ct. 2772, 2778 (2010). This is because regardless of whether a contract as a whole is valid, agreements to arbitrate are severable from a larger contract, and may therefore be separately enforced and their validity separately determined. *Rent-A-Center*, 130 S. Ct. at 2778. Thus, in order to qualify as a question of arbitrability that the court may consider, the challenge must "relat[e] to the making and performance of the agreement to arbitrate." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967).

In *Rent-A-Center, West, Inc. v. Jackson*, the Supreme Court found that the plaintiff failed to challenge the validity of the arbitration agreement at issue. The contract containing the general agreement to arbitrate disputes also contained a specific agreement to arbitrate questions of arbitrability. 130 S. Ct. at 2777. To eliminate the confusion caused by an agreement to arbitrate nested within another agreement to arbitrate, the *Rent-A-Center* Court found it necessary to distinguish between the overall arbitration agreement (the "contract"), and the agreement to arbitrate arbitrability (the "delegation clause"). *Id*. at 2778-79. The problem was that the plaintiff "challenged only the validity of the contract as a whole" rather than the validity of the delegation clause. *Id*. at 2779. Because the delegation clause was severable from the contract, it was unaffected by the contract's validity; thus, the Supreme Court held that in accordance with the valid delegation clause, questions of arbitrability (including the

13

arbitrability of the overall agreement to arbitrate) must go to an arbitrator. *Id*. at 2778-79.

Tenet argues that, like the plaintiff in *Rent-A-Center*, Quilloin should have challenged some specific clause within the FTP and Employee Acknowledgement, rather than challenging the arbitration agreement as a whole. However, *Rent-A-Center* is inapposite. First, it is important to note that unlike the agreement in *Rent-A-Center*, the FTP and Employee Acknowledgement constitute an agreement to arbitrate employment issues generally; they do not purport to contain an agreement to arbitrate arbitrability. *Cf. Rent-A-Center*, 130 S. Ct. at 2777. Because the parties have not indicated otherwise, the question of arbitrability is one for the court. *See Puleo*, 605 F.3d at 178.

Additionally, *Rent-A-Center* did not require Quilloin to challenge a specific clause. In *Rent-A-Center*, identification of a specific clause was necessary merely because there were two arbitration agreements, and the one at issue (the agreement to arbitrate arbitrability) was specifically located within the "delegation clause." Here, unlike the contract in *Rent-A-Center*, the FTP and Employee Acknowledgement contained only one agreement to arbitrate. There was no need to distinguish between multiple agreements to arbitrate; all that Quilloin needed to do was challenge the validity of the only agreement to arbitrate. *See Rent-A-Center*, 130 S. Ct. at 2778; *Prima Paint*, 388 U.S. at 404.

Because Quilloin did not agree to arbitrate the issue of arbitrability, and because she claims that the arbitration agreement, specifically, is unconscionable, the District Court

14

did not err in addressing the validity of the agreement to arbitrate. Thus, we turn to the merits of Quilloin's claims to determine whether the District Court properly denied Tenet's motion to compel arbitration.

## B.

We generally apply state contract principles to determine whether an arbitration agreement is unconscionable. *Concepcion*, 131 S. Ct. at 1746 (construing the FAA, as codified at 9 U.S.C. § 2). However, the FAA preempts conflicting state rules that either prohibit arbitration outright, *id*. at 1747, or that "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress . . . ." *Id*. at 1753 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Thus, in determining unconscionability, we must use principles of Pennsylvania law, to the extent that such law is not displaced by the FAA.

To prove unconscionability under Pennsylvania law, a party must show that the contract was both substantively and procedurally unconscionable. *Salley v. Option One Mortg. Corp.*, 925 A.2d 115, 119 (Pa. 2007). In examining these two prongs, the Pennsylvania Supreme Court has indicated that it might be appropriate to use a "sliding-scale approach" so that "where the procedural unconscionability is very high, a lesser degree of substantive unconscionability may be required" and presumably, vice-versa. *Id*. at 125 & n.12. We turn first to the District Court's finding that the arbitration agreement might be substantively unconscionable.

### 1. Substantive Unconscionability

15

A contract or provision is substantively unconscionable where it "unreasonably favors the party asserting it." *Salley,* 925 A.2d at 119. Put another way, "[s]ubstantive unconscionability refers to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent." *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 181 (3d Cir. 1999) (citing *Germantown Mfg. Co. v. Rawlinson*, 491 A.2d 138, 145-47 (Pa. Super. Ct. 1985); *Denlinger, Inc. v. Dendler,* 608 A.2d 1061, 1068 (1992)). An arbitration agreement cannot be construed as substantively unconscionable where it "does not alter or limit the rights and remedies available to [a] party in the arbitral forum . . . ." *Edwards v. HOVENSA, LLC*, 497 F.3d 355, 364 (3d Cir. 2007) (construing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991)).

In denying Tenet's motion to compel arbitration, the District Court found three bases on which the arbitration agreement might be substantively unconscionable: (1) a potential prohibition against recovery of attorneys' fees and costs, (2) potential inclusion of a class action waiver, and (3) the possibility that Tenet could "run out the clock" on the statute of limitations. We disagree with the District Court's conclusions, and find no basis for substantive unconscionability.

### a. Attorneys' Fees

Provisions requiring parties to be responsible for their own expenses, including attorneys' fees, are generally unconscionable because restrictions on attorneys' fees conflict with federal statutes providing fee-shifting as a

16

remedy. *See Spinetti v. Serv. Corp. Int'l*, 324 F.3d 212, 216 (3d Cir. 2003) (Where called for by statute, "arbitrators . . . must ordinarily grant attorney fees to prevailing claimants rather than be restricted by private contractual language." (internal citation and quotation marks omitted)); *accord Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 203 (3d Cir. 2010); *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 267 (3d Cir. 2003); *Parilla v. IAP Worldwide Servs., VI, Inc.*, 368 F.3d 269, 278-79 (3d Cir. 2004).

Tenet and Quilloin dispute whether the arbitration agreement allows the prevailing party to recover attorneys' fees. The agreement contains no clear prohibition against fee-shifting; the District Court wrote that "it is unclear whether the contract deprives employees of the right to recover attorney's fees and costs." *Quilloin*, 763 F. Supp. 2d at 725. In one clause, the FTP states that "[y]ou and the company will be responsible for the fees and costs of your own respective legal counsel, if any, and any other expenses and costs, such as costs associated with witnesses or obtaining copies of hearing transcripts." However, another provision in the FTP could be read as giving the arbitrator authority to grant attorneys' fees to the prevailing party: "*Authority of Arbitrator*: The arbitrator has the authority to award any remedy that would have been available to you had you litigated the dispute in court under applicable law." It also states that "no remedies that otherwise would be available to you or the company in a court of law will be forfeited by virtue of the agreement to use and be bound by the FTP."

17

We agree with the District Court that the arbitration agreement is ambiguous regarding the award of attorneys' fees, but find that the District Court erred in determining that it could not compel arbitration before resolving the issue. The Supreme Court has clearly established that ambiguities in arbitration agreements must be interpreted by the arbitrator. *PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 406-07 (2003); *accord Puleo*, 605 F.3d at 179. It explained that "we should not, on the basis of mere speculation that an arbitrator might interpret . . . ambiguous agreements in a manner that casts their enforceability into doubt, take upon ourselves the authority to decide the antecedent question of how the ambiguity is to be resolved." *PacifiCare*, 538 U.S. at 406-07 (citation and internal quotation marks omitted); *see also Alabama State Fed'n of Labor v. McAdory*, 325 U.S. 450, 461 (1945) ("It has long been [our] considered practice not to decide abstract, hypothetical or contingent questions . . . .").

In *PacifiCare Health Systems v. Book*, respondents challenged the enforceability of arbitration agreements on the basis that the agreements could "be construed to limit the arbitrator's authority to award damages . . . ." 538 U.S. at 402. The United States Court of Appeals for the Eleventh Circuit denied petitioners' requests to compel arbitration, on the basis that this potential limitation rendered the arbitration agreements unenforceable. *Id*. at 403. The Supreme Court reversed, noting that such a "preliminary question" is not truly a question of arbitrability for the court to decide, *id*. at 407 n.2, and holding that "since we do not know how the arbitrator will construe the remedial limitations, the questions whether they render the parties' agreements unenforceable

18

and whether it is for courts or arbitrators to decide enforceability in the first instance are unusually abstract." *Id.* at 407. Rather than speculate as to whether a certain interpretation of an ambiguity might render an arbitration agreement unenforceable, "the proper course [in such a case] is to compel arbitration." *Id.*

The issue presented here is virtually indistinguishable from the issue in *PacifiCare*. Like the *PacifiCare* respondents, Quilloin challenges the enforceability of the arbitration agreement based on speculation that the agreement might be interpreted to limit the arbitrator's authority to fashion a remedy. Quilloin's claim would require the District Court to decide a "preliminary question" before addressing the issue of unconscionability, and as *PacifiCare* noted, such a "preliminary question" is not truly a question of arbitrability. *Id.* at 407 n.2. Under *PacifiCare*, we are required to find that the ambiguity regarding attorneys' fees is a question for the arbitrator.

### b. *Class Action Waiver*

Under Pennsylvania law, class action waivers are substantively unconscionable where "class action litigation is the only effective remedy" such as when "the high cost of arbitration compared with the minimal potential value of individual damages denie[s] every plaintiff a meaningful remedy." *Thibodeau v. Comcast Corp.*, 912 A.2d 874, 883-84 (Pa. Super. Ct. 2006).

Here, the arbitration agreement does not contain an express class action waiver. Silence regarding class

19

arbitration generally indicates a prohibition against class arbitration, but the actual determination as to whether class action is prohibited is a question of interpretation and procedure for the arbitrator. *Stolt-Nielsen, S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1775 (2010). The District Court acknowledged that the determination was for the arbitrator, but proceeded to analyze whether a class action waiver would render the arbitration agreement substantively unconscionable, if the arbitrator were to determine that the agreement contained such a waiver. *Quilloin*, 763 F. Supp. 2d at 727 & n.22.

As with the issue of attorneys' fees, the District Court erred in addressing the hypothetical situation that might or might not arise depending on the arbitrator's interpretation of the arbitration agreement. *See PacifiCare*, 538 U.S. at 406-07. Furthermore, even if the agreement explicitly waived Quilloin's right to pursue class actions, the Pennsylvania law prohibiting class action waivers is surely preempted by the FAA under *Concepcion*, 131 S. Ct. at 1740.

After the District Court denied Tenet's motion to compel, the Supreme Court ruled in *Concepcion* that a California law deeming certain class action waivers to be unconscionable was an "obstacle to the accomplishment and execution" of the FAA, and was therefore "inconsistent with" and preempted by the FAA. 131 S. Ct. at 1750-51, 1753. Specifically, the *Concepcion* Court found that "[a]rbitration is poorly suited to the higher stakes of class litigation" because: (1) "the switch from bilateral to class arbitration sacrifices the principal advantage of arbitration—its informality[,]" (2) it is "at the very least odd to think that an arbitrator would be

20

entrusted with ensuring that third parties' due process rights are satisfied[,]" and (3) "class arbitration greatly increases risks to defendants." *Id*. at 1751-52. California's law did not deem class action waivers to be *per se* unconscionable, but was based in part on the reasoning that "class proceedings are necessary to prosecute small-dollar claims that might otherwise slip through the legal system." *Id*. at 1753. The Supreme Court dismissed this reasoning, ruling that "States cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons." *Id*.

Following and relying on *Concepcion*, we found a similar New Jersey law to be preempted. The New Jersey law held that "a waiver of class-wide dispute resolution would be improper in the context of either litigation or arbitration[,]" and unconscionability thus "provide[d] a defense against '*all* waivers of class-wide actions, not simply those that also compel arbitration[.]'" *Litman v. Cellco P'ship*, 655 F.3d 225, 229 (3d Cir. 2011) (citation and internal quotation marks omitted) (construing *Muhammad v. County Bank of Rehoboth Beach*, 912 A.2d 88 (N.J. 2006)). Our *Litman* ruling is directly applicable here:

> "We understand the holding of *Concepcion* to be both broad and clear: a state law that seeks to impose class arbitration despite a contractual agreement for individualized arbitration is inconsistent with, and therefore preempted by, the FAA, irrespective of whether class arbitration is desirable for unrelated reasons."

21

*Litman*, 655 F.3d at 231 (internal citation and quotation marks omitted).

The Pennsylvania law at issue here is clearly preempted under *Concepcion* and *Litman*.[5] The Pennsylvania law is not substantively different from the California law, which is unquestionably preempted by the FAA. Like the California law, Pennsylvania law does not render class action waivers *per se* unconscionable. Rather, Pennsylvania finds such waivers substantively unconscionable where "class action litigation is the only effective remedy" such as when "the high cost of arbitration compared with the minimal potential value of individual damages denie[s] every plaintiff a meaningful remedy." *Thibodeau*, 912 A.2d at 883-84.

Like the law in *Litman*, the Pennsylvania law "seeks to impose class arbitration despite a contractual agreement for individualized arbitration" and is therefore preempted. *See id*. at 231. In fact, the Pennsylvania law is even more egregious than the New Jersey law. *See Litman*, 655 F.3d at 229 n.5. The New Jersey rule against class action waivers applied to litigation and arbitration alike, *id*. at 229, while

---

[5] On this, we agree with numerous district courts. *See Brown v. TrueBlue, Inc.*, No. 1:10-cv-0514, 2011 WL 5869773, at *5 (M.D. Pa. Nov. 22, 2011); *King v. Advance Am.*, Nos. 07-237, 07-3142, 2011 WL 3861898, at *5-6 (E.D. Pa. Aug. 31, 2011); *Black v. JP Morgan Chase & Co.*, No. 10-848, 2011 WL 3940236, at *70 n.25 (W.D. Pa. Aug. 25, 2011); *Clerk v. Cash Central of Utah, LLC*, No. 09-4964, 2011 WL 3739549, at *3-5 (E.D. Pa. Aug 25, 2011).

Pennsylvania law has often prohibited class action waivers based on their arbitration-specific context. *Id*. at 229 n.5 (citing *Gay v. CreditInform*, 511 F.3d 369, 395 (3d Cir. 2007)). Thus, the Pennsylvania law presents an even greater obstacle to the fulfillment of the FAA's purposes than does the New Jersey law, because it is exactly the type of law that "single[s] out the provisions of arbitration agreements[,]" *Harris*, 183 F.3d at 183, and that "derive[s] [its] meaning from the fact that an agreement to arbitrate is at issue." *Concepcion*, 131 S. Ct. at 1746.

### c. *Running Out the Clock*

Finally, Quilloin claims that the arbitration agreement is unconscionable because it would permit Tenet to "run out the clock" on the statute of limitations. The FTP requires employees to follow several internal steps and procedures before submitting a claim to arbitration; because the FTP only gives Tenet approximate time limits to respond to each step in the procedure, Quilloin argues that the FTP allows Tenet to delay until claims have expired under the statute of limitations.

Tenet first responds that any claim regarding the possibility for delay has been mooted because Quilloin tolled the statute of limitations by filing this claim. Tenet contends that there is now no danger of delays running out the clock because Quilloin will be able to bring her claim through either arbitration or litigation with no danger of exceeding the statute of limitations.

23

Mootness implicates our jurisdiction and is thus determined based on Article III justiciability principles. *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 537 (1978); *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1108 n.8 (3d Cir. 1985). Under "Article III[,] judicial power extends only to actual cases and controversies" and "[a]n actual controversy must be extant at all stages of review . . . ." *Turner v. Rogers*, 131 S. Ct. 2507, 2514 (2011) (internal citations and quotation marks omitted).

Here, the controversy pertains to unconscionability under Pennsylvania law, which measures unconscionability at the time of the contract's making. 13 Pa. Cons. Stat. Ann. § 2302(a). Although Tenet claims that the arbitration agreement's provision for delay can no longer be unconscionable, it mistakenly measures unconscionability in the present moment, based on what has happened since the contract was signed, rather than based on whether the contract was unconscionable at the time of its formation. Thus, the fact that Quilloin has tolled the statute of limitations in the present instance does not abrogate or in any way moot her claim that the contract was unconscionable at its formation.

Turning to the substance of the claim, time limitations in arbitration agreements are substantively unconscionable if they are "clearly unreasonable and unduly favorable" to the employer. *See Nino*, 609 F.3d at 202 (quoting *Alexander*, 341 F.3d at 266). Quilloin contends that the time limits in *Nino v. Jewelry Exchange, Inc.*, presented "the mirror image of the time limits" here. However, we find *Nino* to be inapposite. In *Nino*, the employee was provided with only a five-day window within which to file and preserve a complaint, a

24

window which the court found substantively unconscionable because it was "clearly unreasonable . . . ." 609 F.3d at 202-03 (quoting *Alexander*, 341 F.3d at 266); *see also Alexander,* 341 F.3d at 266 (finding a time limit of thirty days to be "clearly unreasonable and unduly favorable" to the employer). These cases involved "clearly unreasonable" time limits placed on the employee, rather than estimated time limits placed on the employer's response. Quilloin fails to explain how a process allowing an employee the full amount of time permitted under law is unconscionable, even if the employer is given guidelines, rather than strict parameters, within which it may respond.

Even if Tenet tried to delay and failed to move forward with proceedings within a reasonable time, Quilloin could have filed a motion to compel arbitration. *See, e.g., Allen v. Apollo Group, Inc.*, No. Civ.A.H-04-3041, 2004 WL 3119918, at *9 (S.D. Tex. Nov. 9, 2004).

Given the existence of reasonable time guidelines for Tenet to act, paired with the fact that Tenet could not preclude Quilloin's claim because she always had the option to motion to compel arbitration, the time guidelines are not "clearly unreasonable and unduly favorable" to Tenet. *See Nino*, 609 F.3d at 202 (quoting *Alexander*, 341 F.3d at 266). We fail to see how, even considering the facts in the light most favorable to Quilloin, there is any genuine dispute of material fact regarding this claim of substantive unconscionability.

We find that Quilloin raised no genuine dispute of material fact regarding substantive unconscionability;

25

therefore, the District Court erred by denying Tenet's motion to compel arbitration.

## 2.        Procedural Unconscionability

Even if Quilloin had raised a genuine dispute of material fact as to substantive unconscionability, we would nonetheless find that the District Court erred in denying Tenet's motion to compel arbitration because Quilloin did not raise a genuine dispute of material fact as to whether the arbitration agreement was procedurally unconscionable. Quilloin argues that procedural unconscionability arises because she was not informed that she would have to commit to arbitrate disputes in order to be employed by Tenet, that no one explained to her the terms of the agreement, and that she had little time or choice but to accept its terms and sign.

A contract is procedurally unconscionable where "there was a lack of meaningful choice in the acceptance of the challenged provision[.]" *Salley*, 925 A.2d at 119. A contract will be deemed procedurally unconscionable when formed through "oppression and unfair surprise." *Witmer v. Exxon Corp.*, 434 A.2d 1222, 1228 n.16 (Pa. 1981) (citation and quotation marks omitted). Courts "should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds for the revocation of any contract." *Gilmer*, 500 U.S. at 32-33 (internal citation and quotation marks omitted).

Under Pennsylvania law, a contract is generally considered to be procedurally unconscionable if it is a

26

contract of adhesion. *McNulty v. H&R Block, Inc.*, 843 A.2d 1267, 1273 & n.6 (Pa. Super. Ct. 2004); *but cf. Salley,* 925 A.2d at 125-26; *id*. at 128 (suggesting that not all contracts of adhesion are procedurally unconscionable). A contract of adhesion is a "standard-form contract prepared by one party, to be signed by the party in a weaker position, usually a consumer, who adheres to the contract with little choice about the terms." *Chepkevich v. Hidden Valley Resort, L.P.*, 2 A.3d 1174, 1190 (Pa. 2010) (internal citation and quotation marks omitted).

However, contracts cannot be deemed unconscionable "simply because of a disparity in bargaining power." *Witmer*, 434 A.2d at 1228; *accord Gilmer*, 500 U.S. at 32-33. "[T]he Supreme Court . . . made clear in *Gilmer v. Interstate/Johnson Lane Corp.* [that] more than a disparity in bargaining power is needed in order to show that an arbitration agreement was not entered into willingly." *Great W. Mortg. Corp. v. Peacock*, 110 F.3d 222, 229 (3d Cir. 1997). Parties frequently possess varying degrees of bargaining power, and there is a "range of ordinary and acceptable bargaining situations[.]" *Salley*, 925 A.2d at 120 n.3. Our role is to distinguish acceptable bargaining situations from those which violate "strong public policy[.]" *Id*.

Factors we must consider in determining whether the contract rises to the level of procedural unconscionability include: "the take-it-or-leave-it nature of the standardized form of the document[,]" "the parties' relative bargaining positions," and "the degree of economic compulsion motivating the 'adhering' party[.]" *Salley,* 925 A.2d at 125

27

(quoting *Delta Funding Corp. v. Harris*, 912 A.2d 104, 111 (N.J. 2006)).

In *Zimmer v. CooperNeff Advisors, Inc.*, we considered the plaintiff's educational background and "the context in which the 'take-it-or-leave-it' ultimatum was issued" in determining that the contract did not rise to the level of procedural unconscionability. 523 F.3d 224, 229 (3d Cir. 2008). Zimmer was a highly educated economist and willingly accepted an offer of employment, knowing that the formal employment agreement had not yet been finalized, and further, he did not allege that he lacked an opportunity to negotiate. *Id.*; *see also Gilmer*, 500 U.S. at 32-33 (no procedural unconscionability where experienced businessman was neither coerced nor defrauded when he complied with his employer's requirement that he register – and sign an included arbitration agreement – with the New York Stock Exchange).

Similarly, in *Great Western Mortg. Corp. v. Peacock*, the appellant argued that she accepted the arbitration agreement "only because she was the weaker of the two parties to the employment contract." *Peacock*, 110 F.3d at 229. Peacock was undoubtedly the weaker party. *Id.* Additionally, her employer notified her that she would be required to sign an agreement to arbitrate upon beginning her employment, but she did not sign the actual arbitration agreement until several weeks after she began working. *Id.* at 224, 228. Nevertheless, we found that the agreement was not procedurally unconscionable because Peacock agreed to arbitration on three different occasions, she was a college graduate with a Business Administration degree, and she did

28

not contend that she failed to read the document containing the arbitration agreement, or that she was coerced into signing it. *Id*. at 228-30.

At the other end of the spectrum, we found procedural unconscionability in an employment agreement where the employee, though college educated, was told to read and sign an employment contract, and was dependent on the employer, one of the world's largest jewelry retailers, for his immigration status and his "very capacity to work in St. Thomas[.]" *Nino*, 609 F.3d at 196-97, 202. Similarly, we held unconscionable an arbitration agreement between a multi-national business and minimally-educated crane operators. *Alexander*, 341 F.3d at 266.[6]

Quilloin's situation is nothing like that of the plaintiffs in *Nino* or *Alexander v. Anthony Intern., L.P.* The District Court acknowledged that Tenet had less bargaining power than the multinational corporations in both of those cases. More importantly, Quilloin was neither a minimally-educated crane operator as were the plaintiffs in *Alexander*, nor

---

[6] Although *Great Western Mortgage Corp. v. Peacock*, *Nino v. Jewelry Exchange, Inc.*, and *Alexander v. Anthony Intern., L.P.*, apply New Jersey and Virgin Islands law, the cases provide useful reference points because the principles of procedural unconscionability are substantially similar under the laws of those jurisdictions. *See Salley*, 925 A.2d at 125 (drawing procedural unconscionability principles from New Jersey law); *Zimmer*, 523 F.3d at 228-29 (analogizing to case applying Virgin Islands law).

dependent on her employer for her immigration status as was the plaintiff in *Nino*.

Although Quilloin did not possess the same level of education or specialized skills as the plaintiff in *Zimmer*, her situation appears to be much like the plaintiff's situation in *Peacock*. Like Peacock, Quilloin argues that she was in an unequal bargaining position because she was just an employee signing a form agreement. Like Peacock, Quilloin might not have seen or signed the actual arbitration agreement until after beginning her employment. As in *Peacock*, we acknowledge that the employee is the weaker party to the agreement, *Peacock*, 110 F.3d at 229; however, like Peacock, Quilloin did not lack a meaningful choice. She had a college degree, and chose to agree to the arbitration agreement on more than one occasion. Even if she was not initially informed of the agreement at either time she was hired, the fact remains that she quit her employment at Tenet to work for another employer, and then chose to go back and work once again for Tenet, subject to the Employment Agreement and the FTP. When Quilloin went back to her job at Tenet, the question of whether she actually remembered the arbitration agreement is of no consequence; we must presume that she was rehired knowing about the arbitration agreement which she had already signed, because parties are presumed to have knowledge of contracts they have signed. *See, e.g.*, *Morales v. Sun Constr., Inc.*, 541 F.3d 218, 221-22 (3d Cir. 2008); *Denlinger*, 608 A.2d at 1069-70.

Under such circumstances, we reject Quilloin's argument that there was unfair surprise or a lack of time to consider or learn the meaning of the terms of the agreement.

30

We find that Quilloin did not lack a meaningful choice in agreeing to arbitrate, and she thus raised no genuine dispute of material fact with regard to procedural unconscionability.

## IV.

For the foregoing reasons, we hold that the District Court erred in denying Tenet's motion to compel arbitration. We will therefore reverse the order of the District Court and remand with instructions to stay litigation proceedings and compel arbitration.